UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                     :

JEREMY ZIELINSKI,                    :

                Plaintiff,    :

                          :              12 Civ. 1160 (JPO)

           -v-              :

                          :          OPINION AND ORDER

JOANNE M. DEFREEST, *et al.*,    :

               Defendants.  :

                          :
-------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiff Jeremy Zielinski brings this civil rights action, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. § 1985, against Defendants Joanne M. DeFreest, Jay P. Driscoll, Christopher McNeill, and Christine Connolly.  Plaintiff alleges violations of the First, Fourth, Fifth, and Sixth Amendments to the Constitution, seeking injunctive relief and damages.  Before the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I.      Background

### A.     Factual Background[1]

      Plaintiff Jeremy Zielinski was, at all relevant times, on supervised released as part of his sentence following a 2006 conviction in the United States District Court for the District of New

---

[1] The following facts are taken from the First Amended Complaint (First Amended Complaint, Dkt. No. 23 ("Complaint" or "FAC")), and documents incorporated therein, and for the purposes of this motion to dismiss are assumed to be true.

1

Jersey ("DNJ") for conspiracy to commit access device fraud, in violation of 18 U.S.C. § 371. As a result of his federal conviction, Zielinski was sentenced to a term of 21 months' imprisonment and 2 years' supervised release.  When convicted in the DNJ, Zielinski also had outstanding charges pending in New York State, Warren County, for engaging in sexually explicit communications with an undercover officer posing as a minor.

After his federal sentencing, Zielinski was transferred to New York state custody, where he pleaded guilty to one count of attempted dissemination of indecent material to a minor; one count of promoting sexual performance by a child; and one count of bail jumping, and was subsequently sentenced to a term in state prison.  As a result of this conviction, Zielinski was registered as a Level 2 convicted sex offender with New York State.[2]

Zielinski was advised by his attorney at the time of his DNJ plea that any term of supervised release would run concurrently with a subsequently imposed state sentence.

---

[2] While Zielinski does not allege his status, it is evident from the publicly available New York Sex Offender Registry, and accordingly, is a fact of which the Court may take judicial notice. *See, e.g.*, *Ricks v. New Chrysler*, No. 10 Civ. 9674 (SAS), 2011 WL 3163323, at *1 n.3 (S.D.N.Y. July 22, 2011) ("Plaintiffs' allegations are sparse and would fail to state a claim without construing the Complaint liberally because of plaintiffs' pro se status.  Thus, this factual background is largely taken from attachments to New Chrysler's motion, but pertains to publicly available information of which the Court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence." (citation omitted)); *accord Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (clarifying standard).

Accordingly, Zielinski believed that his federal term of supervised release would run concurrently with, and accordingly expire during, his state incarceration.

Plaintiff was released from state prison on January 28, 2011, and had no expectation of federal supervision. However, on or around August 1, 2011, the United States Probation Office ("USPO") for the DNJ contacted Zielinski, stating that he was required to be supervised pursuant to the DNJ sentence until January 28, 2013. As Zielinski was living in New York, the DNJ transferred jurisdiction of his supervised release to the Northern District of New York.

Defendant Joanne M. DeFreest ("DeFreest"), a USPO officer, was assigned primary supervision of Plaintiff, and Defendants Jay P. Driscoll ("Driscoll") and Christopher McNeill ("McNeill"), also USPO officers, occasionally assisted in Zielinski's supervision.

At the time of sentencing, the DNJ court imposed four special conditions of supervised release, which were as follows: full financial disclosure; prohibition of incurring any new debts; provision of DNA; and submission to computer equipment inspections. Zielinski alleges that on two separate occasions DeFreest attempted to force him to accept imposition of "sex offender" conditions, including one barring contact with his own son, but Zielinski refused. And while the original requirements of Zielinski's supervised release did not include any "sex offender-specific" conditions, such as limiting contact with minors, on February 2, 2012, Zielinski's conditions were modified after a hearing before Judge McAvoy in the Northern District of New York to include a prohibition on direct or indirect contact with minors other than Plaintiff's own child.

Several months prior to this hearing and imposition of the sex offender conditions, on October 13, 2011, DeFreest presented Zielinski with a directive on USPO letterhead, signed by Driscoll and McNeill, which forbade Zielinski from leaving his home on Halloween—October

3

31, 2011 (the "Halloween Directive" or "the Directive").  Additionally, the Directive prohibited the placement of signs, decorations, decorative lights, or perceived invitations on Zielinski's family home, including the offering of "intriguing treats."  Zielinski was also forbidden from answering the door if anyone under eighteen years of age was knocking or was with the knocking individual.  While the original Directive was not specifically addressed to Plaintiff, DeFreest explained that it was a categorical restriction, applicable to all those on supervisory release for sex crimes, registered as sex offenders, or with pending charges of a sexual nature.

At the time he received it, Zielinski objected to the Directive on the grounds that (1) he was not on supervised release for a sexual offense; (2) his conditions in no way limited the types of expressive or associational activities in which he was permitted to engage; (3) the Directive violated his right to celebrate the holidays with his family; and (4) prior to imposition of such conditions, there would need to be a modification hearing that expressly addressed his supervised release conditions and the proposed modifications thereto.  Additionally, Zielinski objected to the fact that the Directive purported to apply to his entire family home, rather than solely to him. Zielinski also claimed the Directive to be vague, as it failed to define many ambiguous terms, such as "perceived invitations" and "intriguing treats."

In response to Zielinski's objections, DeFreest stated that the USPO could issue such directives even in the absence of specific authorization from the sentencing court.  She also claimed that one of the standard conditions of release requires a supervisee to follow any instructions issued by a probation officer.  After Zielinski again objected to the characterization of the USPO's authority, he met with both DeFreest and Driscoll, at which point the two officers reiterated that they would seek revocation of supervised release if he did not comply with their instructions as stated in the Directive.

4

On October 25, 2011, Plaintiff made a written demand that Defendants rescind their Directive before Halloween.  The Directive remained in place.  On October 28, 2011, Plaintiff telephoned Assistant Deputy Chief Probation Officer Christine Connolly and explained his objections to the Directive.  During that phone conversation, Connolly admitted that Defendants lacked the authority to alter the conditions of Zielinski's supervised release without a modification hearing.  Instead of correcting the unlawful actions of DeFreest, McNeill, and Driscoll, however, Connolly reiterated that Zielinski was required to follow instructions given by probation officers, adding that he should follow through on resolving the issue in court. Connolly did, however, modify the Directive to the extent of permitting Zielinski to attend his workplace on October 31, 2011.

As a result of the Directive, Plaintiff and his family were prohibited from celebrating Halloween together as they had planned.  Zielinski also notes that once Halloween was over, there were no means by which a reviewing court could repair the damage to Zielinski and his family's rights by returning them to what he refers to as the status quo ante.

As noted above, a modification hearing was later held before Judge McAvoy in the Northern District of New York, on February 2, 2012, and the conditions of Zielinski's supervised release were modified to reflect sex offender-specific conditions.  For example, all parties agree that Judge McAvoy modified Zielinski's conditions to, *inter alia*: (1) prohibit direct or indirect contact with minors, excepting Zielinski's own child; (2) mandate avoidance of any area where minors are likely to congregate; and (3) require sex offender registration.  (Declaration of Ellen Blain, Dkt. No. 29 ("Blain Decl."), at Ex. G.)  Zielinski did appeal the validity of these conditions (Compl. at ¶ 15 n.1), but the Second Circuit, upon review, held that Zielinski's sex offense justified the imposition of sex offender conditions of supervised release.  *See United*

5

*States v. Zielinski*, No. 12-595 Cr., 2013 WL 536095, at *3 (2d Cir. Feb. 14, 2013) ("On the facts presented in this appeal, we conclude that Zielinski's relevant sex offense is not too remote so as to justify the imposition of sex offender conditions of supervised release.").

**B.      Procedural Background**

Zielinski filed his first Complaint in this action in November 2011.  (Dkt. No. 1.)  In May 2012, Defendants moved to dismiss the Complaint (Dkt. No. 16), and in July 2012, Zielinski filed the FAC, which is the operative Complaint for the purposes of the instant motion (Dkt. No. 23), together with his opposition to Defendants' motion (Dkt. No. 24).  Defendants again moved to dismiss the FAC on September 14, 2012.  (Dkt. No. 27.)[3]

**II.      Legal Standard**

**A.      Motion to Dismiss**

A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss under Rule 12(b)(6), however, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Cruz v. Rose Associates, LLC*, No. 13 Civ. 0112 (JPO), 2013 WL 1387018, at *1 (S.D.N.Y. Apr. 5, 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Whenever "the plaintiff pleads factual content that allows the court to draw the reasonable

---

[3] Zielinski did not re-file his opposition to Defendants' original motion, but to the extent that the arguments therein have bearing on the instant motion, the Court considers them in opposition.  "'*Pro se* status does not . . . excuse a plaintiff from compliance with the pleading standards of the Federal Rules of Civil Procedure.  Nor does the latitude accorded a *pro se* litigant excuse him from meeting the requirements necessary to respond to dispositive motions.'  At the same time, *pro se* complaints are read liberally and interpreted as raising the strongest arguments they suggest.  These rules govern the Court's analysis."  *Jean-Laurent v. Lawrence*, No. 12 Civ. 1502 (JPO), 2013 WL 1129813, at *3 (S.D.N.Y. Mar. 19, 2013) (quoting *Payne v. Oldcastle Precast, Inc.*, No. 10 Civ. 887 (BSJ)(FM), 2012 WL 5873595, at *1 (S.D.N.Y. Nov. 19, 2012) (citations omitted)).

inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), the claim is said to possess facial plausibility.  *See ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that a plaintiff must plead "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'" (quoting *Twombly*, 550 U.S. at 546) (footnote omitted)).  While *Iqbal* and *Twombly* mandate plausibility, they do not require a "heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8."  *Artista Records, LLC v. Doe 3*, 604 F.3d 110, 110 (2d Cir. 2010). Moreover, plausibility is not tantamount to probability, but is rather a lesser burden.  *See Twombly*, 550 U.S. at 556.

When faced with a motion to dismiss, courts are required to "accept as true all of the factual allegations contained in the complaint," *id.* at 572 (quotations and citations omitted), drawing "all inferences in the light most favorable to the non-moving party[] . . . ."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Nevertheless, "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## B.    Qualified Immunity

As a defense to Plaintiff's claims, Defendants assert qualified immunity.  (Memorandum of Law in Support of the Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 28 ("Def.'s Mem."), at 20.)  Qualified immunity protects federal officials, such as probation officers, from liability for discretionary actions made during the scope of their official duties whenever: (1) "[the] 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *or* (2) "it was

7

'objectively reasonable . . . to believe that [their] actions were lawful at the time of the challenged act.'" *Id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quotations and citation omitted)).  Although qualified immunity acts as an affirmative defense, it constitutes "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).  Accordingly, it is appropriate to decide the issue of qualified immunity, when raised, early in the litigation process. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74-75 (2d Cir. 1998) ("It is also well established that an affirmative defense of official immunity should be resolved as early as possible by the court, and may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint." (citations omitted)); *Torres v. Vill. of Sleepy Hollow*, 379 F. Supp. 2d 478, 483 (S.D.N.Y. 2005) ("[T]he availability of qualified immunity ought to be decided by a court at the earliest possible opportunity— preferably at the outset of the case, at which point plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial.").

## III.   Claims for Monetary Relief

### A.   Fifth Amendment Claim[4]

Zielinski alleges violations of his Fifth Amendment rights associated with the imposition of various conditions of supervised release by Defendants, who are probation officers, rather than by a district court judge at his sentencing or a properly held modification hearing.

---

[4] Zielinski also asserts a Sixth Amendment claim, alleging that his right to counsel was denied when the conditions of his supervised release were modified without a hearing, as mandated by Federal Rule of Criminal Procedure 32.1.  To the extent, however, that Zielinski asserts a Sixth Amendment claim, that claim is subsumed into his Fifth Amendment Due Process claim, as the gravamen of Zielinski's Sixth Amendment claim is that he was denied counsel because he was denied a hearing at which he would have had the right to counsel.  Accordingly, he does not separately state a Sixth Amendment claim.

Zielinski brings his Fifth Amendment claims pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971),[5] in which the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). *Bivens* involved "a victim of a Fourth Amendment violation by federal officers," permitting him to bring a suit for money damages against the offending officers. *Id.*; *see also Carlson v. Green*, 446 U.S 14, 18 (1980) (noting that in *Bivens*, the Supreme Court "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right"). Since the doctrine's inception, the Supreme Court has "been reluctant . . . to 'extend' *Bivens* liability further," only doing so twice: "in the contexts of 'an implied damages remedy [1] under the Due Process Clause of the Fifth Amendment' in *Davis v. Passman*, 442 U.S. 228 (1979), and [2] under 'the Cruel and Unusual Punishments Clause of the Eighth Amendment' in [*Carlson*]." *Arar v. Ashcroft*, 585 F.3d 559, 596 (2d Cir. 2009) (Sack, J., dissenting) (citations omitted). In light of *Davis*, the Second Circuit has held that "[a] deprivation of procedural due process rights can give rise to a *Bivens* claim . . . ." *Id.* (same) (citing *Tellier v. Fields*, 280 F.3d 69, 80-83 (2d Cir. 2000) (holding that prisoner legitimately raised a procedural due process claim under the Fifth Amendment pursuant to *Bivens* when he alleged that he was confined in administrative segregation for 514 days without a proper hearing as required by regulations)); *see also Espinoza v. Zenk*, No. 10 Civ. 427, 2013 WL 1232208, at

---

[5] To the extent that Zielinski asserts his claims for monetary relief against the officers in their official capacities, these claims are in essence against the State, and thus barred by sovereign immunity. *See King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). Accordingly, the Court construes Zielinski's damages claims against the officers as claims against Defendants in their individual capacities.

*7 n.11 (E.D.N.Y. Mar. 27, 2013) (citing *Tellier* and noting that *Bivens* applies to Fifth Amendment procedural due process claims); *Maglietti v. Nicholson*, 517 F. Supp. 2d 624, 632 (D. Conn. 2007) ("The Supreme Court has held in [*Davis*] that a private right of action exists for claims under the Due Process clause of the Fifth Amendment.  Therefore, Maglietti may assert claims for violations of her due process and equal protection rights under the Fifth Amendment[]." (footnote omitted)).  Accordingly, Zielinski may assert his procedural due process claim pursuant to *Bivens*.

The Due Process Clause of the Fifth Amendment mandates that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  Claims concerning deprivations without due process of law can take the form of substantive or procedural claims.  Where, as here, the gravamen of the allegation is that the deprivation occurred without the proper process, the claim is, by its nature and terms, a procedural one.  *See Gordon v. Nicoletti*, 84 F. Supp. 2d 304, 308 (D. Conn. 2000) ("Procedural due process claims concern the adequacy of the procedures provided by the governmental body for the protection of liberty or property rights of an individual.").  In order to determine whether Zielinski has stated a claim for procedural due process violations, the Court must look to "(1) whether [Zielinski] had a protected liberty interest in not being confined . . . and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law."  *Tellier*, 280 F.3d at 80 (quotations and citations omitted); *accord Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir. 1989) ("For appellants to establish a procedural due process violation, they must: (1) identify a [liberty] right, (2) establish that governmental action with respect to that [liberty] right amounted to a deprivation, and (3) demonstrate that the deprivation occurred without due process." (citation omitted)).

The Sentencing Reform Act of 1984, § 212(a)(2), 98 Stat. 1999, "eliminated most forms of parole in favor of supervised release, a form of postconfinement monitoring overseen by the sentencing court, rather than the Parole Commission." *Johnson v. United States*, 529 U.S. 694, 696-97 (2000) (citation omitted).  Supervised release is a form of punishment, imposed by the court as an alternative to, or in addition to, incarceration.  *See* 18 U.S.C. § 3583(a).  Under this statutory scheme, the court also has the power to modify or revoke a term of supervised release in light of the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7).  *See id.* § 3583(e) (permitting the court to terminate, extend, or revoke a term of supervised release).  Before modifying the terms of supervised release, however, the court must ordinarily hold a hearing, at which the supervisee has a right to counsel and "an opportunity to make a statement and present any information in mitigation."  Fed. R. Crim. P. 32.1(c)(2)(A)-(C).

Here, prior to the Halloween Directive, Zielinski was subject to several special conditions of supervised release, which included full financial disclosure; prohibition on incurring any new debts; provision of DNA; and submission to computer equipment inspections.  The Halloween Directive modified these conditions, despite the fact that Zielinski's original terms of supervised release were unrelated to his status as a sex offender, and included no sex offender-specific conditions.  The Halloween Directive imposed new conditions of supervised release on Zielinski. At the very least, the Halloween Directive restricted Zielinski's movements in a manner unrelated to, and not authorized by, the judge-imposed conditions of supervised release originally mandated at his sentencing.  Such a restriction implicates Zielinski's liberty, as it literally compelled him to remain inside his home.  (*See* Compl., Ex. B ("You are instructed to be inside your home, with the door locked by 6 pm, on Monday, October 31, 2011.").)  In

response, Defendants assert that the Halloween Directive fell under the umbrella term in Zielinski's original conditions that required Zielinski, like all supervisees, to "follow the instructions of the probation officer." (*Id.*, at ¶ 22.)  This assertion is untenable.  The requirement to "follow the instructions of the probation officer" does not provide a license for the probation officer to impose new conditions.  Rather, it can only permissibly refer to those instructions that reasonably derive from judge-imposed conditions of supervised release.  *Cf.* U.S.S.G. § 5B1.3(b) ("*The court* may impose other conditions of probation . . . .").  It is axiomatic that "making defendants' liberty contingent on the discretion of the probation office constitutes an impermissible delegation of judicial power."  *United States v. Kieffer*, 257 F. App'x 378, 380-81 (2d Cir. 2007) (citation omitted); *accord United States v. Peterson*, 248 F.3d 79, 84-85 (2d Cir. 2001) (holding that while "the District Court had adequate justification for prescribing mandatory therapy," in light of Defendant's history as a sex offender, "the special condition, as written, was an excessive delegation to the probation officer," as it allowed the USPO to ambiguously "direct" Defendant's enrollment, attendance, and participation in mental health intervention); *see also Farrell v. Burke*, 449 F.3d 470, 488 (2d Cir. 2006) (rejecting the government's position that the discretion of a probation officer to review items in supervisee's possession in order to determine whether or not they constituted pornography cured the vagueness of a condition that prohibited pornography, noting that the delegation "creates 'a real danger that the prohibition on pornography may ultimately translate to a prohibition on whatever the officer personally finds titillating.'" (quoting *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) (citation and quotations omitted)).  If excessive delegation to a probation officer can constitute an impermissible abdication of the court's role in imposing punishment, *a fortiori*, the wholesale designation of conditions of supervised release by the USPO without any guidance

from a court is improper.  Zielinski's liberty was restricted in a way that avoided legal process, as it occurred outside the bounds of the requisite statutory structure for supervised release and modifications thereof.

Because additional terms of supervised release were imposed upon Zielinski in what was an impermissible discretionary act on the part of the defendant probation officers, without the proper procedure of a modification hearing, and because those terms restricted his liberty in a cognizable manner, Zielinski has alleged the elements of a procedural due process violation.

### B.    Fourth Amendment Claim

Zielinski also brings a Fourth Amendment claim, alleging that he was effectively seized, because he was forced to remain in his home on the evening of October 31, 2011.  As *Bivens* itself involved a Fourth Amendment claim, Zielinski may permissibly assert such a claim.  *See, e.g.*, *United States v. Acosta*, 502 F.3d 54, 60 (2d Cir. 2007) ("One would think that the facts underlying an alleged violation of § 3109 would form the basis for attacking the propriety of the search as also violative of the Fourth Amendment.  If such is the case, a cause of action for damages may lie against the federal officer under [*Bivens*]." (citations omitted)); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 127-28 (D. Conn. 2010) ("The defendants do not argue that Fourth Amendment harms cannot be remedied by *Bivens*, since *Bivens* itself squarely allowed remedies for Fourth Amendment violations.  Instead, they argue that review of any constitutional harm in the immigration context is inappropriate under *Bivens*.").

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A "seizure," within the meaning of the Fourth Amendment, occurs where "in view of all of the circumstances surrounding the incident, a reasonable person would have believed

13

that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J., plurality) (footnote omitted); *accord Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000). Even when an individual is seized by state or federal actors, the seizure may nevertheless fail to give rise to a Fourth Amendment violation if reasonable.  In determining the reasonableness of a given seizure, courts apply different tests based on the variant of seizure at issue.  For example, in order to engage in an investigative detention, or *Terry* stop, officers must possess reasonable suspicion; however, "[a]s the level of intrusiveness rises, [and] an encounter between the police and a citizen is more properly categorized as an arrest—the second category of seizures of the person," the seizure must be "supported by probable cause."  *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (quotations and citations omitted).  As an exception to these strictures, "it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a 'reasonable' seizure if it is justified by 'exigent circumstances.'"  *Tenenbaum v. Williams*, 193 F.3d 581, 604 (2d Cir. 1999) (citations omitted).  The rationale behind this "exigent circumstances" exception "as it pertains to law enforcement officials is '[t]he need to protect or preserve life or avoid serious injury.'"  *Id.* at 605 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).  The Second Circuit has also recognized that, in some contexts, "special needs" might render the probable-cause analysis "impracticable," meaning some other discussion of reasonableness will sometimes be required to determine the permissibility of a given seizure.  *Id.* at 603 ("Although all agencies of government are governed by the unreasonable searches and seizures provision of the Fourth Amendment, there are some agencies outside the realm of criminal law enforcement where government officials have 'special needs beyond the normal need for law enforcement [that] make the warrant and probable-cause requirement impracticable.'" (quoting *O'Connor v. Ortega*, 480 U.S. 709, 720 (1987) (plurality opinion)).  Notably, the Supreme Court has defined

the probation system as one such "special need." *See Griffin v. Wisconsin*, 483 U.S. 868, 873-74

(1987) ("A State's operation of a probation system, like its operation of a school, government

office or prison, or its supervision of a regulated industry, likewise presents 'special needs'

beyond normal law enforcement that may justify departures from the usual warrant and

probable-cause requirements."); *see also United States v. Reyes*, 283 F.3d 446, 461 (2d Cir.

2002) ("[The *Griffin* special needs] principles apply *a fortiori* to federal supervised release,

which . . . is 'meted out in addition to, not in lieu of, incarceration.'" (quoting *United States v.*

*Cardona*, 903 F.2d 60, 63 (1st Cir. 1990)).

Here, Zielinski was seized within the meaning of the Fourth Amendment.  He was

directed, by the USPO, to remain in his home for a certain amount of time and ordered not to

participate in Halloween activities, prohibited even from answering the door.  In a meaningful

sense, Zielinski's movements and activities were restricted, and he was not permitted to leave his

home during a certain time period.  As a supervisee, under standard conditions of probation,

Zielinski was well aware of the consequences of disobeying even an illegitimate order from a

USPO—consequences that could have resulted in an immediate modification or revocation of his

probation under the applicable statutory scheme.  *See, e.g.*, 18 U.S.C. § 3583(e)(2)-(3).   The

reasonableness question, however, is more difficult, as Zielinski's seizure is clearly neither an

arrest nor an investigative *Terry* stop.  Accordingly, the USPO's authority to seize Zielinski in

this manner, which did not derive from court-imposed conditions of supervised release, would

have to have stemmed from either the so-called "exigent circumstances" exception, *see*

*Southerland v. City of New York*, 680 F.3d 127, 157-58 (2d Cir. 2011) (discussing the exigent

circumstances exception in the context of child-removal by the state in cases of suspected child

abuse or neglect), *or* the "special needs" exception as applicable to the probation system, *see*

*United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004) ("In most cases, reasonableness requires a warrant and probable cause.  The Supreme Court has, however, demarcated certain areas in which a lesser-or even nonexistent-level of individualized suspicion is sufficient to render a search constitutional.  The two such intersecting spheres of principal relevance to this appeal are those of probationary and (other) 'special needs' searches."  (internal citation omitted)).

First, when determining whether exigent circumstances allow for warrantless (or suspicion-less) search or seizure, courts examine the existence of an "'urgent need' to render aid or take action."  *See United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (discussing whether exigent circumstances justified warrantless entry (citations omitted)).  Here, there has been no showing of exigent circumstances warranting Zielinski's seizure.  True, Zielinski is a registered sex offender, but his status as such, without more, does not justify the probation officers' discretionary seizure in light of their own perceived dangers associated with Halloween.  Moreover, while Halloween does invite contact between minors and the adults whose homes they visit in pursuit of candy, at the time the Directive was issued, Zielinski was free, by the terms of his supervised release, to interact with minors.  Defendants cite the gravity of Zielinski's sex crimes as justification for the Halloween Directive.  (*See* Def.'s Mem. at 25.)  While it is true that Zielinski's crimes are indeed deplorable (*see, e.g.*, Blain Decl., Ex. E), that fact does not establish the "urgent need" associated with exigent circumstances.

Second, as for the "special needs" exception, its particular application in the probation context derives from the need for supervision, on the part of the UPSO, "'to assure that [court-imposed] restrictions are in fact observed.'"  *Lifshitz*, 369 F.3d at 178 (quoting *Griffin*, 483 U.S. at 875).  And while prevention of "probationers' future violations of the law" is another interest

16

served by the probation system, it is the *monitoring* of probationers' *compliance with conditions* of their supervised release that constitutes the "special need" that surpasses that of "normal law enforcement," whereas the prevention of future violations is "continuous with other law enforcement interests." *Id.* at 179 (quotations and citation omitted). Defendants are correct that supervisees can be constitutionally subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Griffin*, 483 U.S. at 875. Nevertheless, a seizure of a supervisee's person, based on factors unrelated to any court-imposed condition of supervised release, without more, does not establish a special need. There was no suspicion here that justified the restriction of Zielinski's Halloween movement other than his status as a registered sex offender. *But see United States v. Townsend*, 371 Fed. App'x 122, 125 (2d Cir. 2010) (holding that a warrantless search of parolee was justified by the "special needs" exception when parole officer had "received specific information from law enforcement officials working on an ongoing investigation that suggested contraband might be found in [parolee's] home," and thus finding that "the search did not violate [parolee's] Fourth Amendment rights, and his suppression motion was properly denied"). It is true that the ordinary "requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release." *Reyes*, 283 F.3d at 462 (citation omitted). However, these limitations on a supervisee's constitutional rights must derive from court-imposed conditions, and may not stem from the USPO's independent, however well-intentioned, determination—without any evidence other than a supervisee's status—that an arbitrary seizure is warranted. *Cf. Lifshitz*, 369 F.3d at 181 ("In the case of a probationer, *the imposition of a search condition* as part of probation creates a diminished expectation of

17

privacy." (emphasis added) (citation omitted); *see also United States v. Washington*, No. 12 Cr. 146 (JPO), 2012 WL 5438909, at *5 (S.D.N.Y. Nov. 7, 2012) (noting that "courts have concluded that consent to a special condition of supervised release that authorizes warrantless searches modifies the Fourth Amendment analysis, such that courts need ask only whether 'the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty'" and accordingly denying Defendant's motion to suppress (quoting *United States v. Newton*, 369 F.3d 659, 664-65 (2d Cir. 2004) (citation omitted)).

Due to the seriousness of the sexual offenses involved, the United States Attorney for the Northern District of New York, in conformity with proper procedure, eventually sought a modification hearing. *Id.* At that hearing, Judge McAvoy, in light of Zielinski's crimes, imposed sex offender-specific conditions, and the imposition of those conditions was later affirmed by the Second Circuit. This procedure, which reflects the proper manner in which to limit Zielinski's Fourth Amendment rights, lies in contrast to the curtailment of his rights by the Halloween Directive. It is indeed true, as Defendants note, that supervisees' constitutional rights are limited by the terms of their probation. But these rights are properly restricted only insofar as a court, in the exercise of its legitimate authority, imposes limitations on those rights. An individual's status as a supervisee cannot simply render his constitutional rights a nullity, especially within an area where the sentencing court has not spoken.

### C.    First Amendment Claim

Zielinski also asserts various violations of his expressive and associational rights, as protected by the First Amendment. With respect to Plaintiff's First Amendment claims for damages, Defendants move to dismiss on the ground that a *Bivens* remedy has never been applied in this particular context. Plaintiff, however, asserts that the extension of a *Bivens*

remedy to this context is appropriate, as there can "never be an 'alternative, existing process' for protecting against unlawful prior restraints, because when they are imposed as they were here, the damage is immediate and cannot be undone."  (Pl.'s Opp. at 9.)  Assuming the viability of Plaintiff's First Amendment interest in expressing himself through his Halloween decorations, this claim nevertheless must be dismissed, as the Court declines to extend *Bivens* to Plaintiff's First Amendment claim.

To date, neither the Supreme Court nor the Second Circuit has recognized a *Bivens* action for alleged violations of a plaintiff's First Amendment rights.  *See Iqbal*, 556 U.S. at 675 ("For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, we have not found an implied damages remedy under the Free Exercise Clause.  Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.  Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*." (internal citations omitted)); *Hudson Valley Black Press v. I.R.S.*, 409 F.3d 106, 113 (2d Cir. 2005) ("Today we join our sister circuits and hold that *Bivens* relief is not available to taxpayers who allege First Amendment violations based on retaliatory tax audits.").  In determining whether to extend *Bivens* to a new context—meaning a context in which the court has not previously recognized a *Bivens* claim—courts must engage in a two-part inquiry: first, courts must consider "whether there is an alternative remedial scheme available to the plaintiff," *Arar*, 585 F.3d at 572, and second, if not, whether nevertheless "special factors counsel[ ] hesitation." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (quotations and citation omitted)).

With respect to the first *Wilkie* factor, in examining the appropriateness of extending a *Bivens* remedy to a claim that is potentially governed by an existing statutory apparatus, the

19

Second Circuit affords great weight to "the overall comprehensiveness of the statutory scheme at issue," rather than solely looking to "the adequacy of the particular remedies" provided. *Hudson Valley*, 409 F.3d at 110. Here, Congress, together with the Sentencing Commission, has provided a comprehensive scheme of federal supervised release. *See, e.g.*, 18 U.S.C. § 3583; Fed. R. Crim. P. 32.1. Admittedly, this statutory apparatus does not explicitly allow for the remedy that Zielinski sought here—modification of a condition impermissibly imposed by a probation officer—because supervisees may not, in fact, challenge the *legality* of a given condition at a modification hearing. *See Myers*, 426 F.3d at 123 ("The government argues that, given Myers's current incarceration and uncertain future family circumstances, nothing would preclude Myers from moving to modify the condition under 18 U.S.C. § 3583(e)(2). As the government appeared to concede at oral argument, however, Myers would be unable to challenge the constitutionality of the condition under that provision." (citing *United States v. Lussier*, 104 F.3d 32, 34-35 (2d Cir. 1997) ("The plain language of subsection 3583(e)(2) indicates that the illegality of a condition of supervised release is not a proper ground for modification under this provision" and "does not authorize the court to assess the lawfulness of a condition of release" (footnotes omitted)))). In fact, "[c]onspicuously absent from the list of relevant considerations [courts examine when analyzing whether to modify a condition of supervised release] is the legality of the condition." *Lussier*, 104 F.3d at 32. However, there are other procedures, namely, "a direct appeal under 18 U.S.C. § 3742 or a collateral attack under 28 U.S.C. § 2255," which are "available to challenge the legality of a condition of supervised release . . . ." *Id.* Nevertheless, §§ 3742 and 2255 contemplate conditions as imposed by a court, rather than the situation that Zielinski faced.

These facts, however, do not suggest that Zielinski was entirely without a remedy.  First, Zielinski could have filed a motion in the Northern District of New York—the court with jurisdiction over his offense and probation, seeking relief from the court.  In such a motion, Zielinski could have raised the issue of his probation officers' imposing a condition of supervised release, without a hearing, which was unrelated to the conditions imposed by the original sentencing court.  And while this form of attempted relief is not perfectly tailored to the alleged constitutional harm at hand, the remedies available to a claimant under the remedial scheme in place need not be tantamount to a *Bivens* remedy in order for the first *Wilkie* factor to remain satisfied.  *See Dotson v. Griesa*, 398 F.3d 156, 166-67 (2d Cir. 2005) ("*Chilicky* made clear that it is the overall comprehensiveness of the statutory scheme at issue, not the adequacy of the particular remedies afforded, that counsels judicial caution in implying *Bivens* actions.  The Court emphasized that '[t]he absence of statutory relief for a constitutional violation' is not sufficient, by itself, for courts to imply a cause of action for money damages against the official causing the violation." (citing and quoting *Schweiker v. Chilicky*, 487 U.S. 420, 421-22 (1988)); *see also* Richard H. Fallon, Jr. & Daniel J. Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 Harv. L. Rev. 1731, 1778-79 (1991) ("Within our constitutional tradition, we argue, the *Marbury* dictum reflects just one of two principles supporting remedies for constitutional violations.  Another principle, whose focus is more structural, demands a system of constitutional remedies adequate to keep government generally within the bounds of law.  Both principles sometimes permit accommodation of competing interests, but in different ways.  The *Marbury* principle that calls for individually effective remediation can sometimes be outweighed; the principle requiring an overall system of remedies that is effective in maintaining

a regime of lawful government is more unyielding in its own terms, but can tolerate the denial of particular remedies, and sometimes of individual redress.").

Second, even if the current scheme of federal supervised release is construed as one absent even a general remedy for supervisees like Zielinski, certain considerations caution against the creation of a new remedy for alleged First Amendment violations such as the one here.  The fact remains that supervisees' constitutional rights, including their First Amendment rights, are not coextensive with those of ordinary citizens.  *Loy*, 237 F.3d at 259 ("As a convicted felon sentenced to a term of supervised release, Loy's constitutional rights do not have the same scope as those of ordinary persons." (citing *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 265 & n.14 (9th Cir. 1975) (observing that "probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free" and that "[m]erely because a convicted individual's fundamental rights are involved should not make a probation condition . . . automatically suspect")).  And as such, district courts are free to impose discretionary conditions of supervised release limiting those rights that are particularly tailored to the relevant defendant and his specific crime.  *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(b)-(d).  While a so-called "rogue agent" (Pl.'s Opp. at 8) may occasionally overstep the parameters of this scheme and attempt to impose additional conditions, to hold that any supervisee in Zielinski's position has a remedy at law for the First Amendment harms imposed by such behavior would upset the balance of a carefully constructed statutory scheme.  Accordingly, even if the first *Wilkie* factor were met, the Court declines to extend a *Bivens* remedy to federal supervisees who object that the interpretation and enforcement of conditions by their probation officers adversely affect their First Amendment rights.

22

### D.    Qualified Immunity

As a defense to all of Plaintiff's claims, Defendants raise qualified immunity, asserting that it was objectively reasonable for the officers to "believe in the legality of their actions." (Def.'s Mem. at 19.)  The Court disagrees, as Defendants characterize the reasonableness of their actions using the wrong level of generality.  In particular, Defendants' position—that it was reasonable, given Plaintiff's status as a sex offender, for the probation officers to limit his movement on Halloween—ignores the unreasonableness of imposing a condition independent of a determination by the sentencing or modifying court.

### 1.    Clearly Established Law

Defendants first assert that Plaintiff's First and Fourth Amendment rights were not clearly established.  (Def.'s Mem. at 23 n.8.)  Regardless of the clarity in scope of Plaintiff's First Amendment right to celebrate Halloween and Fourth Amendment rights as a supervisee, it is nevertheless clearly established that probation officers may not replace the Court as the decisionmaking body that determines the conditions of supervised release.

In this district, a right is clearly established if it has been recognized by the Second Circuit or the Supreme Court.  *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (citing *Young v. Cty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).  The Second Circuit, in *Peterson*, held that while it was permissible for the lower court, in light of the supervisee's offense, to prescribe mandatory sex offender therapy, the condition, as written, constituted an *impermissible* delegation of authority to the probation officer, as it allowed the probation officer to determine *whether* the supervisee would attend therapy at all.  *See* 248 F.3d at 85.  The *Peterson* court noted that mandatory therapy, whose details, "including the selection of a therapy provider and schedule," would be determined by the probation officer, constituted such an improper

23

delegation, because the "issue of the defendant's participation in therapy" was left "to the discretion of the probation officer." *Id.* Thus, the Second Circuit has clearly held that, under the statutory scheme, it is the *court*, not the USPO, that possesses the authority to determine whether to impose a given condition of supervised release. *See, e.g.*, *Myers*, 426 F.3d at 130 ("We note that, although it would be proper for the district court to *postpone* determining whether a special condition is necessary, the district court may not improperly *delegate* this determination to the probation office." (citing *Peterson*, 248 F.3d at 85 (emphasis in original)).   "Fixing the terms and conditions of probation is a judicial act which may not be delegated," *Whitehead v. United States*, 155 F.2d 460, 462 (6th Cir. 1946), and therefore certain delegations "from a court to a probation officer would contravene Article III of the United States Constitution," *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995).

In addition to the clarity of the distinction between the court's role and the USPO's role, as associated with supervised release, the Federal Rules of Criminal Procedure are unambiguous in their governance of the process by which a probationer's conditions may be modified.  As discussed, Rule 32.1 states that "[b]efore modifying the conditions of probation or supervised release, the court must hold a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation."  Fed. R. Cr. P. 32.1(c)(1).  The only exceptions to this hearing requirement are when (1) the supervisee waives the right to hearing; or (2) where the relief sought is favorable to the supervisee and the government does not object to the favorable modification.  *Id.* at 32.1(c)(2)(A)-(C).  Similarly, the statutory scheme governing supervised release provides that the *court*, not the USPO, may terminate, extend, or revoke a term of supervised release.  *See* 18 U.S.C. § 3583(e)(1)-(4).

24

Here, the probation officers' Directive arguably went beyond even an impermissible delegation, as there never was a pertinent substantive condition imposed by the court. *Compare United States v. Voelker*, 489 F.3d 139, 143 (3d Cir. 2007) (holding that court-imposed condition which prohibited defendant from associating with minors without the prior approval of the Probation Officer impermissibly allowed the probation officer to become "the sole authority for deciding if Voelker will ever have unsupervised contact with any minor, including his own children, for the rest of his life," constituting "unbridled delegation" previously rejected by the Third Circuit (citing *Loy*, 237 F.3d at 266). Instead, here the situation involved the imposition of a condition *by* the USPO, *without any prior guidance from* the court. Whatever Zielinski's crimes, and whatever the limitations on his First and Fourth Amendment rights given his status as a probationer, it was clearly established at the time Defendants issued the Halloween Directive that conditions of supervised release must be imposed by the court; and while the USPO may "manage aspects of sentences and [] supervise probationers and persons on supervised release with respect to all conditions imposed by the court," *Johnson*, 48 F.3d at 808, they may not generate conditions themselves. Indeed, while "a ministerial act or support service" may of course be assigned to a probation officer, "'the ultimate responsibility' of imposing the sentence" lies with the court and the court alone. *United States v. Nash*, 438 F.3d 1302, 1305-06 (11th Cir. 2006) (quoting *United States v. Bernardine*, 237 F.3d 1279, 1283 (11th Cir. 2001)). Here, Defendants took it upon themselves to exercise this ultimate responsibility, altering Zielinski's conditions of supervised release without a modification hearing. Nor was there a court determination of the 3553(a) factors prior to the modification effected by the Halloween Directive, as required by 18 U.S.C. § 3583(e).

25

### 2.    Objective Reasonableness

Having determined that Defendants violated clearly established law by engaging in a substantive modification of the terms of Zielinski's supervised release without seeking a hearing as required by Rule 32.1, the Court next turns to whether their actions were nevertheless objectively reasonable.  As discussed, even where officers violate clearly established law, so long as they act in an objectively reasonable manner, they will remain shielded by the doctrine of qualified immunity.

Officers act objectively reasonably when, in light of clearly established law and the information they possessed at the applicable time, "officers of reasonable competence could disagree on the legality of the defendant's actions."  *Lennon*, 66 F.3d at 420 (quotations and citation omitted).  Conversely, "[a]n officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420-21.  It has been stated, by both the Supreme Court and the Second Circuit, that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Thus, even where clearly established law is violated, a court must scrutinize the objective reasonableness of the relevant conduct in determining officers' liability. Accordingly, the question here is whether it was objectively reasonable for Defendants to impose a condition of supervised release on Zielinski without first adhering to proper procedure and seeking a modification hearing.

In support of their position that it was objectively reasonable to limit Plaintiff's contact with children on Halloween, Defendants cite two cases from this circuit in which courts found defendant probation officers to be qualifiedly immune from liability after directing probationers

26

to sex offender mental health treatment.  *See Rose v. Goldman*, No. 02 Civ. 5370, 2009 WL

4891810, at *7-8 (E.D.N.Y. Dec. 9, 2009), *report and recommendation adopted*, No. 02 Civ.

5370, 2011 WL 1130214 (E.D.N.Y. Mar. 24, 2011) (holding that it was objectively reasonable

for a defendant probation officer to direct plaintiff, who was sentenced to state probation based

on a guilty plea to a nonsexual offense, to undergo sex offender therapy); *Henderson v. Heffler*,

No. 07 Civ. 0487C, 2010 WL 2854456, at *1, *4-5 (W.D.N.Y. July 19, 2010) (holding that it

was objectively reasonable for the probation officer to direct supervisee to attend sex offender

therapy when the "Order of Probation provide[d] that, '[a]t the direction of the Probation

Officer,' defendant was to 'attend, actively participate and remain in sex offender treatment and

comply with all the rules and regulations of the program'").  While the *Henderson* court was

faced with qualified immunity analysis in light of a discretionary directive from the sentencing

court, the *Rose* court faced an issue closer to the one presented here: an imposition of a sex

offender specific-condition by a state probation officer, in the wake of a sentencing court's

imposition of standard conditions, after conviction for a nonsexual offense.  In its analysis, the

*Rose* court cited the probation officer's "reliance on the presentence report to refer plaintiff to [a

treatment facility] for an evaluation to determine whether he was appropriate for [sex offender]

treatment" as objectively reasonable, especially in light of accusations that the supervisee was

permitting his children to watch pornography and smoke marijuana in the home.  *Id.* at *8.

Importantly, and in distinction to this case, Rose's original conditions of probation, as imposed

by the sentencing court, included an order for a mental health assessment, and later, mental

health assessment was listed as a special condition of Rose's probation.  *Id.* at *1.  Here, in

contrast, the original, standard conditions of supervised release failed to direct Zielinski to

undergo any form of mental health treatment, sex offender-specific or otherwise, as directed by his probation officers or otherwise.

Defendants further contend that the following facts underscore the reasonableness of Defendants' belief "that limiting Plaintiff's interaction with children did not violate any constitutional right Plaintiff might have had regarding holiday celebrations or temporary modifications of his supervised release[:]" (1) Plaintiff committed sexual crimes against minors, in violation of N.Y. Penal Law §§ 110.00/235.22, 215.56; (2) Plaintiff is a registered sex offender with New York state; (3) at the time of the Halloween Directive's issuance, Zielinski was under an order of protection from New York Family Court, directing him to stay away from his minor child; and (4) the NDNY PO had access to information detailing Zielinski's crimes, which revealed he was a sexual sadist, that he was engaged in the production of child pornography, and that he was "likely to repeat his sexual crimes against minors." (Def.'s Mem. at 24-25.) According to Defendants, these facts, taken together, underscored the overarching reasonableness of the "narrowly tailored" Halloween Directive, which was designed, quite reasonably, "to minimize [Zielinski's] opportunity to interact with, and therefore temptation to commit criminal acts with, minors." (*Id.* at 25.) Defendants bolster their argument by noting that the Halloween Directive's restrictions were, in fact, "in keeping with the conditions later imposed by the district court," which, they contend, emphasizes their reasonableness.

While the Court does not disagree that a supervisee's status as a Level 2 registered sex offender and child pornographer makes sex offender-specific conditions of supervised release reasonable, it does not follow that the imposition of such conditions by the probation officers, without approval by the court, reflects the same degree of reasonableness. Had Zielinski been subject to sex offender-specific conditions from the advent of his federal supervised release,

some oversteps on the part of Defendants in the administrative effectuation of those conditions would be a strong candidate for qualified immunity. However, the situation here is different. Defendants, in fact, attempted to persuade Zielinski to waive his right to a hearing before modifying his conditions, and, when he refused, they imposed the Halloween Directive regardless. Title 18 U.S.C. § 3583 requires a court, before modifying a term of supervised release, to examine the factors set forth in § 3553 (a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). Moreover, as discussed, a supervisee has a right to speak at his hearing and right to counsel, before his terms are modified in an unfavorable way. *See generally* Fed. R. Cr. P. 32.1. Here, Defendants supplanted the role of the court without regard to Zielinski's constitutional rights. And the fact that a supervisee's constitutional rights are more limited than those of a normal citizen does not make Defendants' determination here any more reasonable, because a supervisee's rights may not be limited at the whim of the USPO, but rather, are cabined by a court's statutory determination. Moreover, the fact that Defendants originally attempted to convince Zielinski to comply with sex offender-specific conditions, waiving his hearing rights, and then later, together with the U.S. Attorney, successfully sought a modification through proper channels, suggests that they were aware of the relevant law and its strictures, but chose to ignore it.

The Court concludes that no reasonable probation officer could think it appropriate to impose a condition on a supervisee entirely independent of a judicial determination. Accordingly, qualified immunity does not support dismissal at this stage.

## IV. Claims for Equitable Relief

In addition to his *Bivens* claims, Plaintiff seeks injunctive relief prohibiting Defendants from: (1) "issuing any further 'instructions' unless they are to implement other more specific

conditions of release imposed by the sentencing court;" and (2) "enforc[ing] [] the Halloween letter or any substantially similar restrictions against the plaintiff or any other person under their supervision, [or against persons not under their supervision], absent prior judicial authorization or such person's consent[.]"  Zielinski also seeks: an order removing DeFreest from her position as a probation officer (Compl. at ¶¶ C-E, H), as well as a declaration that (1) the Officers violated his constitutional rights; (2) probation officers may only "issue instructions that implement, and that are consistent with, other more specific conditions of supervised release;" and (3) "violation of the constitutionally-protected rights of a person under their supervision is sufficient cause to remove a probation officer from their position . . . 'for cause'" (*id.* at ¶¶ A, B, G.)

Defendants move to dismiss Plaintiff's claims for equitable relief on the grounds that subject matter jurisdiction and standing are lacking.

To the extent that Zielinski seeks injunctive and declaratory relief against Defendants in their individual capacities, his claims must fail, as the true party in interest is the United States government, rather than the officers themselves.  *Cf. Connecticut v. Cahill*, 217 F.3d 93, 106 (2d Cir. 2000) ("In determining who is the real party in interest, the 'general rule' is that relief sought nominally against an officer is in fact against the sovereign if 'the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (citations omitted)).  Put another way, any suit against the officers for injunctive relief must be one against them in their official, rather than individual, capacities.

Individuals' right to seek injunctive and declaratory relief against state or federal officers in their official capacities for alleged constitutional violations is well established.  *See Larsen v.*

*Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949) ("Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions."); *see also Ex Parte Young*, 209 U.S. 123, 159 (1908). Even where equitable relief is properly sought, however, a plaintiff must nevertheless comply with Article III's standing requirements. *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 330 (S.D.N.Y. 2012) ("In order to bring a suit in federal court, a plaintiff must demonstrate that he or she possesses standing to bring that suit."). Accordingly, "the irreducible constitutional minimum of standing contains three elements[:]" (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest"; (2) "there must be a causal connection between the injury and the conduct complained of," meaning "the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) the injury must be likely "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted) (alterations in original).

The injury in fact must reflect a "concrete and particularized" harm, which is "actual or imminent," rather than "conjectural or hypothetical." *Id.* at 560, 565. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n.1. Additionally, the redressability of the challenged action through a favorable court decision "must be 'likely,' as opposed to merely 'speculative.'" *Id.* at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976)). These requirements derive "from the constitutional provision of jurisdiction to federal courts to hear 'cases' or 'controversies.'" *Fort Worth*, 862 F. Supp. 2d at 331 (quoting U.S. Const. Art. III, § 2); *accord Allen v. Wright*, 468 U.S. 737, 750-51

31

(1984).  While a party may seek injunctive relief and still satisfy Article III's standing

requirements, notably, "[p]ast exposure to illegal conduct does not in itself show a present case

or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present

adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).  Admittedly, "past wrongs

are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.* at

496.  But the "perceived threat" from which a plaintiff seeks injunctive or declaratory relief must

be "sufficiently real and immediate to show an existing controversy." *Id.*  Put another way, in

order to show more than abstract injury, a "plaintiff must show that he 'has sustained or is

immediately in danger of sustaining some direct injury' as the result of the challenged official."

*City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted).

   Here, given that his term of supervised release ended in January 2013, and he now has no

official contact with the USPO, Plaintiff's desired injunctive relief reflects "only a *fear* of [future

probation restrictions], which is plainly insufficient to establish standing." *Amnesty Int'l. USA v.

Clapper*, 667 F.3d 163, 179 (2d Cir. 2011) (Raggi, J., dissenting from denial of rehearing)

(citations omitted).  The Supreme Court, together with courts in this circuit, have repeatedly

underscored that in the context of injunctive relief: "It is the *reality* of the threat of repeated

injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."

*Lyons*, 461 U.S. at 107 n.8; *accord Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) ("Under

*Lyons*, to establish a sufficient likelihood of a future unconstitutional strip search, Shain would

have to show that *if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if*

he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized

reasonable suspicion that he is concealing contraband, he will again be strip searched.  Such an

accumulation of inferences is simply too speculative and conjectural to supply a predicate for

prospective injunctive relief." (citation omitted)).  Accordingly, "a plaintiff must demonstrate a 'certainly impending' future injury."  *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  It is axiomatic that "[i]n establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought."  *Id.* (citations omitted).

Here, Zielinski alleges that Defendants, in the future, will restrict his speech and associational activities by preventing him again from decorating his family home in Halloween fashion.  (*See* Plaintiff's Memorandum of Law in Opposition, Dkt. No. 24 ("Pl.'s Opp."), at 22 ("[Defendants'] arguments ignore the fact that [Defendants] are going to enforce the same letter again, and that even with the modified condition, most of the letter would have been unconstitutional.").)  This contention, however, ignores the realities of the claimed injury, the likelihood of future harm, and Zielinski's current condition.  For example, at the modification hearing before Judge McAvoy, the conditions of Zielinski's supervised release were modified to reflect the substance of the content of the Halloween Directive.  As noted, Judge McAvoy modified Zielinski's conditions to, *inter alia*: (1) prohibit direct or indirect contact with minors, excepting Zielinski's own child; (2) mandate avoidance of any area where minors are likely to congregate; and (3) require sex offender registration.  (Blain Decl., at Ex. G.)  And despite Zielinski's appeal of the validity of these conditions (Compl. at ¶ 15 n.1), the Second Circuit, upon review, held that Zielinski's sex offense justified the imposition of sex offender conditions of supervised release.  *See Zielinski*, 2013 WL 536095, at *3.  Accordingly, Zielinski cannot obtain redress by a declaration from this Court that the USPO exceeded its powers, or by a removal of DeFreest.

Alternatively, according to Zielinski, Judge McAvoy's conditions are in fact far afield of those outlined in the Halloween Directive, as the latter included further restrictions on decorations and candy, in addition to the standard language concerning contact with minors. Even assuming that the Directive was (1) unconstitutional and (2) broader than Judge McAvoy's imposed conditions, in the *Lyons* sense, Zielinski has failed to convincingly aver that there is "a sufficient likelihood that he will again be wronged in a similar way . . . ." *Lyons*, 461 U.S. at 111. Zielinski simply claims that Defendants will again attempt to prevent him from celebrating Halloween. This argument is akin to one that Lyons would be subject to an unconstitutional chokehold again at some unspecified time in the future. Here, Zielinski pledges that he plans to decorate his home for Halloween, and states that he will again be restricted from doing so when Defendants inevitably issue another Halloween Directive; this future injury is too speculative to pass muster under *Lyons*, especially in light of the fact that the driving impetus behind the Directive—namely, the prevention of Zielinski's contact with minors—has now been implemented by a separate proceeding: the modification hearing before Judge McAvoy. Again, it is well established that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96. Here, there are no present, adverse effects associated with the Halloween Directive, as presumably, Zielinski would not wish to decorate his home for Halloween in early September. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."). Additionally, the aspects of the Directive pertaining to contact with minors were covered in full by Judge McAvoy's findings during the February modification hearing, meaning

that any present restriction on Zielinski's current life derives from the modification hearing, rather than the Halloween Directive.  In sum, Zielinski's claims for equitable relief are associated with a past harm, and fail to reflect any "real and immediate" threat of injury.  *Shain*, 356 F.3d at 215 (quotations and citations omitted).

## V.      Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff's First and Sixth Amendment claims are DISMISSED, as are his claims for declaratory and injunctive relief.  However, with respect to Plaintiff's Fourth and Fifth Amendment *Bivens* claims, Defendants' motion is DENIED.

The Clerk of Court is directed to close the motion at docket entry number 27.


SO ORDERED.

Dated: New York, New York
       September 10, 2013

_____
J. PAUL OETKEN
United States District Judge